ELECTRIC MACHINERY MFG. CO. v.
GENERAL ELECTRIC CO.*
No. 110.

Circuit Court of Appeals, Second Circuit.

Feb. 15, 1937.

Pennie, Davis, Marvin & Edmonds, William H. Davis, W. Brown Morton, Morris D. Jackson, and H. Stanley Mansfield, all of New York City, for plaintiff-appellant.

Charles Neave and Harrison F. Lyman, both of New York City, and Charles E. Tullar, of Schenectady, N. Y., for defendant.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

*Writ of certiorari denied 57 S.Ct. 932, 81 L.Ed. —

CHASE, Circuit Judge.

Suits were brought, one in April, 1931, and the second in December, 1932, charging infringement of certain claims in reissue patent No. 17,180 which is owned by the plaintiff. The patent relates to a method and means for starting synchronous electric motors and for their automatic regulation in operation. It was first issued as original No. 1,640,332 on August 23, 1927, on an application filed by Charles Truman Hibbard January 17, 1920, and was reissued with additional claims on January 1, 1929. Of the additional claims only Nos. 20 and 21 are in suit and no infringement of them is alleged until after the patent was reissued. In the first suit it was alleged that the so-called bumble-bee and tick-tock systems of the defendant infringed and in the second suit a later system of the defendant was accused. These suits were consolidated for trial and will be treated herein as one.

The claims in suit are Nos. 1, 2, 3, 6, 7, 8, 9, 12, 13, 14, 15, 20, 21, 40, and 43. All of them were held valid and 8, 12, 40, and 43 were held infringed. As to so much the defendant has appealed. The remaining claims were held not infringed and the plaintiff appealed. As all the claims have to do with a system of automatic control of a synchronous electric motor using alternating current for power and starting as an induction motor, a proper understanding of the patent and the relation of its subject matter to a prior patent most seriously relied on to show anticipation requires some explanation of both types of motors.

An induction motor, in the only form with which we are now concerned, has two polyphase windings. They are that of the stator, sometimes called the armature or primary winding, and that of the rotor, often called the secondary winding. The stator winding is so arranged that when the switches in the power supply lead-ins are closed a rotating field of electric force is set up. The rotor winding is placed within that of the stator and short circuited within itself, so that when the power is turned on to energize the stator winding induced current flows in the secondary due to the fact that the lines of electrical force cut across the rotor winding. There is a tendency to reduce the cut across the rotor winding which may be attributed to an at-

tempt of the current to follow lines of least resistance or, put slightly differently, to flow in a straight path. So there is a rotary pull on the secondary winding which tends to move it into line with the moving field of the stator winding and produces the torque that turns the rotor. As it turns in starting, and faster as it gains speed up to the maximum, the cut across the rotor winding becomes less abrupt and the induced current there is correspondingly decreased. But the speed of the rotor never reaches that of the moving field in the stator. If it did, there would be no current cut across the rotor winding and so no induced current therein and the motor would stall. The difference between the rotor speed actually attained and synchronous speed is called the slip, and so it is possible to speak of the frequency of the induced current in the secondary as the slip frequency which varies proportionately as the speed of the rotor increases toward or decreases farther from synchronous speed. Overloads on an induction motor not so prolonged as to overheat it create no need for a control system, since the motor operates at all times exactly in the same way from starting up to the limit of its rate of rotation and slowing work but holds back the speed. One of the disadvantages of such a motor, however, is the fact that the induced current in the secondary causes a considerable drain on the power supply which would otherwise be available for translation into torque and so it is desirable to use what is called a synchronous motor where load conditions will permit.

The type of synchronous motor to which we are now attentive starts as an induction motor and pulls into synchronism at the point which may roughly be called the top speed of the induction period of its operation. It has the same polyphase stator winding as does the induction motor briefly described above. But instead of only one winding on the rotor it has two. What will be called its second winding operates just as does the rotor winding of an induction motor. It is commonly called the "squirrel cage" winding from the fact that it consists of parallel bars attached at either end to rings which short the circuit and that construction makes it look somewhat like the wheel of such a cage. The third or additional winding of a synchronous motor is called the field

winding of the rotor and is connected to a separate source of supply of direct current.

When the power alternating current is turned on the stator winding of a synchronous motor the moving field of electrical force revolves as it does in the induction motor. The current cut across the second, or squirrel cage, winding starts the rotor moving as in an induction motor and builds up its speed to the induction maximum, at which point the motor is just out of synchronism. At this point turning the direct current on the third, or field, winding energizes that, causing what is called field excitation, and because it is direct current sets up north and south poles which are so arranged in making the winding that each is so placed as to be attracted by an opposite pole in the moving field of the stator so that the motor pulls into step, i. e., into synchronism, when the attraction asserts itself to pull in and that also locks the rotor magnetically to the rotating stator field. The rotor then revolves at the same speed as does the electrical field of the stator until some force superior to that of the attraction, an overload for instance, pulls it out or a lowering in the line voltage has the same effect. When such a motor so gets out of step its tendency is to return to an induction motor and build up speed until it will again pull into synchronism. But to bring that about switching operations are needed. The direct current in the third, or field, winding is repellant when the motor is running as an induction motor and so it is necessary to continued operation to turn that off at once as synchronism is lost and then to turn it on as synchronous speed is again approached to cause the same pulling into step that occurred before. Then, too, a persistent overload which will heat the motor unduly and prevent its going back into synchronism would burn out the windings in time, so proper regard for safety requires some means for shutting off the power supply if such need arises.

Before the patent in suit, it was customary to perform these switching operations manually. That required much skill on the part of the operator and also his presence near the motor. Besides that, smooth operation was obtained when the direct current was turned on the field winding only when it was done at the instant the alternating current made the

parts of the revolving electrical field of such polarity that the rotor would be physically in the position to have the magnetism created in its field winding by the direct current attract rather than repel and so add to the pull at once in a forward direction. If the rotor were physically in the right position in respect to the revolving electrical field, this pull in would take place smoothly, otherwise there would be jolts which might cause damage. Obviously this turning on of the direct current manually was done more or less intuitively without any means for knowing exactly when the rotor was physically in just the right stage of a turn.

The alleged invention of the patent in suit is that Mr. Hibbard disclosed a system of automatic controls for performing all the switching operations needed to start and run a synchronous motor so that all the operator had to do was to close one switch to turn on the current. That could be as simple as pushing a button located as remotely from the motor as desired. To do that he made use of current induced in the third, or field, winding of synchronous motor about which nothing has yet been said.

It is a fact which has long been known that when the alternating power current is turned on a synchronous motor not only is the stator winding energized and induced currents set up in the squirrel cage winding but currents also are induced in the field winding of the rotor. These currents were considered undesirable. In some stages they did help out the squirrel cage winding but in others they worked against it. They were often referred to as "parasite" currents and sometimes the field winding was left open to prevent the flow of induced current there. Such was the practice of Bradley, as shown by his patent No. 404,466 issued in 1889. But Hibbard found the way to put such currents at work to control the operation of the motor and taught that the field winding should be closed to permit them to flow for that purpose. What he did was to make use of the presence of these so-called parasite currents by recognizing that as their slip frequency varied as that of the current in the squirrel cage winding they would be a reliable index of control for turning the direct current on and off the third winding as well as for all other

needed regulation. He used well-known relays or switches which need not be described, for they worked on the spring and magnet principle long in use; nor will it be necessary to refer to features of his system the defendant is not now accused of using.

He installed a relay in the direct current line leading to the rotor field winding so responsive to the induced current in that winding that it would close when the speed of the rotor was almost that of the revolving electrical field, i. e., when conditions were right for the pull into synchronism, to let in the direct current to bring the motor into step and magnetically lock it there. Claims 8 and 40 relating to this are said to be infringed.

This relay was polarized—sensitive only to either the positive or the negative condition of the alternating current —so that it would close only at the instant the magnetism created in the field winding when the direct current flows in would be in such physical relation, because of the position of the rotor at that instant, to the rotating field of the stator that the rotor would pull forwardly into synchronism. Claim 12 covering this is said to be infringed.

He also installed a relay responsive to the current condition of the field winding to shut off the direct current from that winding when the motor went out of synchronism. Claims 1, 2, 3, 6, 7, 9, 13, 14, and 15 cover this and infringement of them is charged.

And in addition Hibbard provided a relay responsive to the current in the field winding which turned the power current off when an overload kept the motor too long out of synchronism, and also control so responsive for certain switches which applied at starting reduced, and in running full, voltage from the power supply to the stator winding. As to this, claims 20, 21 and 43 are said to be infringed.

The defenses are invalidity, mainly because of anticipation by patent No. 1,-089,659 issued March 10, 1914, on the application of Howard Maxwell to the defendant as assignee, and noninfringement provided the claims in suit should be construed narrowly enough to make them valid over Maxwell.

Consequently it becomes necessary to understand what Maxwell disclosed for

his patent is unquestionably prior art. He dealt in detail only with an induction motor which did not have the third winding found in a synchronous motor where Hibbard centered his control system. Maxwell said in his specification: ·

"My invention relates to a system of control for an alternating current dynamo electric machine and is particularly adapted to such a system in which an alternating current motor is automatically changed from an induction motor to a synchronous motor depending upon load conditions." But he also said that: "My invention is not limited to an induction motor but may be used with a synchronous motor which starts as an induction motor, nor is it limited to a motor of any particular number of phases."

He was primarily concerned with the problem presented by the fact that heavy duty induction motors have to be built with large air gaps and said, "As is well known, induction motors with large air gaps have very low power factors at all loads and especially when under light loads." "Power factor," in so far as its meaning is now material, is a term used in respect to alternating current motors to express the relative amount of power current turned on the motor which is translated into torque and actually exerts the pull which is power. When the electromotive pressure on the motor and the resulting flow of alternating current in the circuit is the same the power factor is at the maximum or unity. But when there is a lag of the resulting current wave behind the voltage wave there is a lagging power factor so-called which is described as less· than 100 per cent. in whatever fraction of unity it may in fact ·be. This lagging current wave with the resulting power factor less than unity is due to the consumption of current in the motor to create · its magnetic field and to the extent that magnetizing current is used the power factor is lowered. Conditions requiring the use of proportionally more magnetizing current reduce the power factor and one typical example of such a condition is an induction motor carrying only a light load. So it becomes plain enough that if some means can be found to decrease the drain of the current turned on an alternating motor from pulling use to magnetizing use the power factor will be improved. And that is just what Maxwell did.

He opened the only winding on the rotor of an induction motor and connected that polyphase winding to a source of direct current by means of a relay tuned to the proper frequency in the current in this winding so that the direct current was let in to excite the rotor field at the right time, and because his relay was polarized, at the right physical relation of rotor winding to revolving electric stator field to` pull the motor smoothly into synchronism where it was held magnetically locked until it was pulled out of step. When that occurred it would run indefinitely as an induction motor until ·conditions were right for it again automatically to go into synchronism. And so Maxwell disclosed an automatic control system, centered on the sole rotor winding of an induction motor, for making such a motor operate as a synchronous motor whenever load conditions permitted such increased efficiency to be attained. Though he also stated baldly that his system might be used with a synchronous motor that started as an induction motor, he said nothing whatever about the third winding of such a motor and so of course nothing about using the current therein as the governor of his control system. It is significant to note such failure for the substantial advance Hibbard made over Maxwell lies in his use of that current. Because the defendant ·insists that any one acquainted with the difference between an induction motor and a synchronous motor which starts as an induction motor would have known that in putting the Maxwell control into the latter the third winding would be the one to open to the supply of direct current, and the plaintiff insists that only the inventive genius of Hibbard disclosed that, the issue on validity turns upon which is correct on that point.

Several practically undisputed facts cannot be ignored in arriving at a just conclusion as to whether what Hibbard did was invention. They are that before Hibbard's disclosure the industry was waiting for a reliable automatic system of control which would make the advantages of synchronous motors available in a wide field to which they could not be adapted while needing such skilled manual control as has been alluded to; and that when Hibbard did provide the needed automatic control it was seized upon eagerly and went into widespread use. No doubt there were other con-

tributing causes for the increased use of such motors, but fairness must compel them to take second place and give the lion's share of the credit for the opening up of new fields of synchronous motor use, which such motors quickly occupied, to the automatic control system that did away with difficult and delicate manual operation of switches. Such results under such circumstances are indicative of invention. See C. & A. Potts & Co. v. Creager, 155 U.S. 597, 15 S.Ct. 194, 39 L.Ed. 275; Benjamin Elec. Mfg. Co. v. Northwestern Elec. E. Co., 251 F. 288 (C.C.A.2); H. D. Smith & Co. v. Peck, Stow & Wilcox Co., 262 F. 415 (C.C.A.2). Then, too, although the defendant itself owned the Maxwell patent, which it is now claimed disclosed all that Hibbard did, for years before Hibbard's control system was so successfully used, the fact that it did not use the slip frequency in the third winding of a synchronous motor in an automatic control system until after Hibbard had shown the way and that it then began to do so is at least a subtle tribute paid to Hibbard by the well informed.

It has been argued that Maxwell's relay for turning on the direct current was unsuitable for use with a synchronous motor, in that it was fitted with an armature having a swinging period which would make it unreliable because it was tuned to a given frequency that might be passed so rapidly that the direct current would not be turned on each time when it should to bring about the pull into synchronism. Apparently this is so, though we put nothing on it since, if true, the needed change would be only to a more suitable relay. The need for such a change, if indeed it is needed at all, is but due to the fact that in a synchronous motor the second or squirrel cage winding is not heavy enough to run the motor as an induction motor for sustained periods without overheating, and so it is important to have a relay that will surely turn on the direct current to excite the third winding each time conditions are right for the pull into synchronism. In an induction motor, on the contrary, if direct current excitation does not take place, nothing but the added efficiency is lost. It will still operate well indefinitely.

But if Maxwell really disclosed the useful and valuable automatic control system for synchronous motors that Hib-

bard years later described in the application on which the patent in suit issued, it is wellnigh incredible that the defendant would not have used it before Hibbard disclosed anything at all. Such considerations as these, coupled with the plain fact that Maxwell merely said his system could be used on a synchronous motor that started as an induction motor, leads us to the conclusion that Maxwell said no more in effect than that his system might work in co-operation with the slip frequency in the squirrel cage winding of a synchronous motor and that the availability of the slip frequency in the third winding to govern a control system was left quite as obscure as before. So we conclude, in agreement with the trial judge, that Hibbard was the first inventor of synchronous motor automatic control based on the varying value of current in the third winding.

The Bradley patent previously mentioned advocated the elimination of the currents Hibbard used and so requires no further comment. The Churchward patent No. 593,716 which issued in 1897 is said to anticipate claim 43 in suit which covers the shutting off of the power current in case of too great an overload. Churchward did show one way to do that. But his somewhat complicated arrangement need not be described further than to point out both that it was considered in the Patent Office and the claim allowed over it and that the action could not well have been otherwise because in Churchward's arrangement the main power supply was automatically shut off only when such conditions prevailed that there was no direct current excitation in the rotor field. The absence of that caused the relay to operate to open the power supply line while claim 43 in suit covers both the control of the direct current for excitation itself and the power supply to the motor. And so we agree with the trial judge that all the claims in suit are valid.

As has already been indicated, the defendant began using an automatic control system for synchronous motors which was governed by current conditions in the third winding only after Hibbard disclosed that method. In 1925 it brought out what was known as its bumble-bee type to get automatic regulation of direct current excitation which differed from Hibbard only in that it had a moving arm in the relay responsive to the

slip frequency in the third winding which could be adjusted to delay the closing of the switch for a predetermined time. All this is to say merely that on the question of infringement there was no difference at all. Then in 1929 the defendant changed to its so-called tick-tock system which differed from the bumble-bee type in that there was substituted for the slipping arm a retarding pendulum to bring about some hesitation in switch closing, but again there was no departure from Hibbard that was sufficient to avoid infringement. After the first of these two actions was begun, the defendant changed its control systems so as to make use of the slip frequency in the third winding to actuate what, as we shall see, is the equivalent of a polarized relay to excite the field by turning on the direct current when the forward pull into synchronism would take place; of another relay which was directly responsive to the power factor and connected to the stator circuit to turn off the direct current from the third winding when the motor got out of step; of still another relay responsive to a thermostat in the squirrel cage winding that turned off the power supply whenever the last-named winding became heated to whatever degree the thermostat had been set to operate the relay; and switches either operated by hand or by an automatic time relay to turn low voltage on the armature winding for starting and increased voltage for running.

Claims 8 and 40 of the patent in suit read as follows:

"8. In a system of the type described, the combination with a motor having an armature winding and a field winding, of means for applying voltage to the armature winding, a source of direct current, a resistance, a two-position switch arranged so that in one position it connects said resistance across the field winding and in the other position it connects the source of direct current to the field winding, and means responsive to the electrical condition of said field winding for operating said switch to disconnect said resistance from the field winding and to connect the source of direct current to the field winding when the motor has reached a predetermined speed."

"40. In a motor starter, the combination with a synchronous motor having a field magnet winding, and starting and running connections for said motor, of a switch controlled in accordance with the value of the current traversing said winding for controlling the circuit of said winding, a switch for effecting the transfer from starting connections to running connections and a relay having an actuating coil in circuit with said winding for controlling the second named switch."

There can be no fair doubt about infringement of claim 8. It reads exactly on both of the defendant's first two systems mentioned. The latest system is really no different in this respect, and we do not understand that the defendant contends it is, being content with its insistence that Maxwell disclosed what it has used. What the defendant does is to use a relay responsive to the slip frequency in the third winding combined with a rectifier connected with it in series to make sure that the current goes on to excite the field only when conditions are right for the smooth forward pull into synchronism, but this is clearly just an equivalent of Hibbard's current application polarized relay.

As to claim 40, infringement depends upon whether the phrase "running and starting connections" limit it to a combination in which there is a relay for changing from low to high voltage after the motor is started. We adopt what the trial judge said about that: "The argument is that the word 'motor' as used in the claim means 'primary' or 'armature,' although these words are not employed. The language of the claim is, I think, plainly opposed to any such construction. Moreover, claims 23 and 26, which are not in issue, specify 'starting and running primary connections for said motor,' emphasizing the clear distinction between them and claim 40; and it is a settled rule of construction that the limitations of particular claims cannot be read into other claims for the purpose of avoiding infringement. Cadillac Motor Car Co. v. Austin (C.C.A.) 225 F. 983, 985; Automatic Recording Safe Co. v. Burns Co. (C.C.A.) 231 F. 985, 986." So we agree that both claim 8 and claim 40 are infringed.

Claim 12 covers the application of the direct current at the right instant to get the smooth forward advance of the rotor into synchronism as follows:

"12. In a system of the type described, the combination with a motor having a

field winding, of means for applying voltage to the armature winding, and automatic means associated with the motor for supplying excitation current to the field winding when the motor has reached a predetermined speed, said automatic means comprising a field switch and a polarized frequency relay responsive to the frequency of the induced current in the main field winding, said relay being in operative connection with said field winding at all times."

The defendant's latest control system is charged with infringement of this claim, and whether it does infringe or not depends upon the meaning which should be given the phrase "in operative connection with said field winding at all times."

If "in operative connection" means "connected in circuit," the claim is so limited that the defendant does not infringe; for its slip frequency relay in combination with its rectifier, which we have already held is the equivalent of Hibbard's polarized relay, is not connected in circuit with the field winding except when the speed of the rotor is below synchronism. As soon as synchronous speed is attained and while it is maintained the connection is broken, but when the rotor drops below such speed the power factor relay to which reference has already been made goes into action and automatically restores the circuit. In this way the relay and rectifier are in circuit at all times when there is any need for them to be so connected, and as the circuit is broken and restored automatically in operation we think it clear that there is operative connection at all times. Our conclusion is supported in part by the fact that claim 11 not in suit is limited to this relay when "connected in circuit with said field winding at all times." And in accordance with the rule of construction mentioned in the discussion of claim 40 the words "in operative connection" should not be held to mean only "connected in circuit," which is but one of the instances in which the condition is fulfilled.

Of claims 20, 21, and 43 covering the automatic opening of the stator circuit to disconnect the power supply in the event of an overload too prolonged to permit the motor safely to work against it, only claim 43 was held infringed. It reads:

"43. In a system of electrical distribution, a source of alternating current, a synchronous dynamo electric machine connected to said source, switching means for controlling the connection of said machine to said source, and means responsive to the slip frequency of said machine for controlling the excitation of said machine and the connection of said machine to said source."

That the defendant does infringe this claim is not so clear. Hibbard himself testified at one time that the defendant did not use a system "in which the connection of the motor to the source of alternating current is controlled in response to conditions in the field circuit," but he explained that, and we think it clear enough that he did not mean all that those words imply. Though Hibbard in his specifications said nothing about disconnecting the power line in the event of an overload, his relay will do that when the motor is kept slowed down enough and we think control responsive to the slip frequency of the machine must be held to cover control that includes shutting off the power supply when, as here, the disclosed relay is connected so that it will actually do that in use. But to infringe, the defendant's relay must be shown to do that in the same or an equivalent way. Hibbard did it with the direct effect of the increased slip frequency in the field, relying solely upon the fact that such frequency varies inversely with the speed of the rotor. So in Hibbard's system when the slip frequency gets high enough the power supply is disconnected, regardless of the degree to which the squirrel cage winding has been heated. And conversely, if the motor should operate long enough so slightly below synchronous speed that the slip frequency did not increase sufficiently to actuate the relay, there might possibly be overheating without cutting off the power.

The defendant's safety relay is, as before stated, directly responsive to a thermostat in the winding. No matter how little or how much the motor departs from synchronism, the relay will not operate until the winding gets hot enough, and when such heating does occur it will shut off the power, regardless of motor speed. Consequently, though what will increase the slip frequency may in time produce the heat that brings about the action of the thermostat, we think it strains

the language of the claim unduly in these circumstances to say that the defendant's relay responds to slip frequency in the way, actual or equivalent, that Hibbard's does. The defendant's relay is responsive to heat however engendered in the winding, and though often that will be accompanied by a slip frequency so high that Hibbard's relay would also cut off the power it need not necessarily be so. Slip frequency so high as to actuate Hibbard's relay, being only a condition present often when the defendant's relay opens the power supply line but not an essential condition, is not the cause of operation in the sense that the relay is responsive to the slip frequency. In view of these considerations, we do not think the claim should be construed so broadly that it will cover the defendant's system. See Westinghouse v. Boyden Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136. Claims 20 and 21 are both tied to "means comprising electro-responsive switches for establishing reduced armature connections for starting and full voltage armature connections for running," and were for this reason held not infringed below. We agree that those claims are not infringed for that reason as well as because of what has already been said regarding claim 43. It is obvious that the manually operated relays of defendant do not infringe and, while it does use an automatic control also, that turning on of increased voltage is in response to the action of a definite time relay instead of one responsive to the slip frequency in the field winding. When full voltage is thus turned on the armature, the control system thereafter works as it does when full voltage is used both to start and to run the motor.

The group of claims relied on in respect to the automatic relay that shuts the direct current excitation off the third winding when the motor gets out of step are fairly illustrated by claim 7. It reads:

"7. In a system of the type described, the combination with a motor having an armature winding and a field winding, of means for applying voltage to the armature winding, a source of direct current, a resistance, means arranged to short circuit the field winding of the motor thru said resistance when the motor is started, a switch for connecting said winding to the source of direct current, and means responsive to the electrical condition of said field winding for simultaneously opening the short circuit thru said resistance and closing said switch when the motor has reached a predetermined speed and for opening said switch when the motor speed falls below a certain value."

In construing this claim, just as in giving effect to the others, sight must not be lost of just what Hibbard's invention was in view of the Maxwell patent.

With that in mind, the problem in respect to this group of claims becomes whether the defendant's control which uses, not Hibbard's polarized relay that both throws off and on the field excitation current as conditions in the field winding dictate, but applies the field excitation as shown in discussing claim 12 and removes it when a field switch is opened by action instigated in response to what is called a power factor relay that is directly controlled by the electrical condition of the stator winding is the equivalent of Hibbard's. Of course, it is not enough to avoid infringement that more than one relay is used to do what Hibbard did with one only. Line Material Co. v. Brady Electric Mfg. Co. (C.C.A.) 7 F.(2d) 48; Barber v. Otis Motor Sales Co. (C.C.A.) 240 F. 723.

But the trial judge found on ample evidence that the defendant's relay "operates after pull-out from synchronism and not before." With that fact established the question is narrowed to whether or not the power factor relay "is responsive to the electrical condition of said field winding. * * *" As it was not so considered below, no infringement was found.

The relay used by the defendant consists of an armature subject to the electrical pull of two coils when they are energized. One of these coils contains current reflecting the voltage and phase of that in the stator circuit and the other in the same respects follows at all times the current condition of that circuit. The resultant of the action of these coils on the armature of the relay accordingly is directly proportional to the power factor. The relay can be, and is, so adjusted that the resultant pull on the armature will not be sufficient to open the circuit so long as the current in the stator circuit does not lag behind its voltage

more than a predetermined amount. But, if the lag exceeds that, the resultant of the pull of the energized coils in the relay will open the circuit when the armature current is great enough to trip it. So the phase relation of the voltage coil to the current coil in the relay corresponds to the power factor. Which means that the relay's operation is dependent upon the same electrical conditions which determine the power factor and so dependent directly upon such conditions in the stator circuit instead of upon the slip frequency in the third winding. Though this provides a control more sensitive than Hibbard's and does away with jolting action he did not overcome, it is not that which distinguishes defendant's relay from what is covered by the claims but the fact, as the trial judge rightly saw, that it is actually governed by the electrical condition of the stator winding. It may well be that what varies the slip frequency in the third winding plays its part on the varying power factor but, even so, it is the power factor, however established at any given time, that controls the relay rather than any one of the causes making the power factor what it then may be; assuming for the moment that the slip frequency in the field may properly be called a cause. We agree that infringement of this group of claims was not shown.

Decree modified in accordance with the foregoing.