## TEXTILE MACH. WORKS v. LOUIS HIRSCH TEXTILE MACHINES, Inc.

### No. 163.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1937.

Darby & Darby, of New York City (Samdel E. Darby, Jr., and Walter A. Darby, both of New York City, of counsel), for appellant.

Howson & Howson, of Philadelphia, Pa. (Dexter N. Shaw and Charles H. Howson, both of Philadelphia, Pa., of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

■ This is an appeal from a decree holding valid and infringed claims 1, 3, 14, and 15 of a patent for an attachment to a "full-fashioning" knitting machine by which parts of the web may be reinforced with an extra thread, or varied by an insert of "split seam work." In "full-fashioning" machines the width of the web depends upon the traverse, or "throw," of the thread carrier which brings the thread to the needles; "fashioning," which means narrowing or widening the web, is accomplished by changing this distance. The mechanism by

which this is made automatically to conform with the desired pattern, need not concern us except to say that the width of the web is the distance between two stops at the ends of the machine, less the length of "carrier bar" upon which the thread carrier is fixed. This difference measures the traverse of the "carrier bar," and thus of the thread carrier. The patented attachment is to control the "throw" of secondary thread carriers, feeding other threads to the needles and fixed upon their own bars. The "throw" of these carriers is limited by stops fastened upon the carrier bars and engaging other stops carried by two nuts, which are in turn threaded upon a reversibly threaded screw shaft. When the "throw" of the secondary thread carriers is to be changed in any way these nuts must move along the screw shaft; and if the "throw" is to be widened or narrowed their distance apart must be increased or diminished, which can be done by rotating the screw shaft. The patent is concerned for the most part with the mechanism which rotates the screw shaft at the proper time and in the proper direction. It is impossible to give a complete description of it without the aid of drawings, but enough for the purposes of this controversy may perhaps be made to appear verbally. The screw shaft is actuated by the main power shaft and its proper periodicity and rotation are secured by two endless belts carrying buttons, set at intervals corresponding with the desired pattern. One of these belts determines when and for how long the screw shaft shall rotate; and the other, its direction. At one end of the screw shaft are oppositely toothed ratchet wheels, each actuated by a pawl normally kept in contact with its wheel by a spring. The shaft is rotated by the oscillation of these pawls through a system of rods, levers and cams, leading from the power shaft. As one of the buttons on the belt comes into position, by this train both pawls begin to oscillate, and if each remained in contact with its ratchet, the shaft would merely idle back and forth through an angular variation of one notch. In order to throw one pawl out of engagement and gain any increment of rotation, a separate train is necessary, controlled by the second pattern belt, which lifts the proper pawl off its wheel when the right time comes. In this way the screw shaft separates or brings together the nuts whose stops engage the stops upon the carrier bars, and limit the "throw" of the secondary thread carriers.

The four claims in suit need not be set out. Numbers fourteen and fifteen are the most detailed; they specify as elements the screw shaft ("spindle"), with its nuts, pattern control for rotating it, and another pattern control for selecting the direction. The defendant's attachment, which is used upon "full-fashioning" machines, is in general of the same character, and all the claims will read upon it without any undue extension, although the trains employed are different. Verbally the only question that could arise is because the defendant used a single pattern belt, on which one row of buttons rotates the screw shaft and the other selects the direction. That would scarcely avoid infringement; at any rate for argument we will assume that it does not, because we think the claims invalid anyway.

Schletter filed his original application in June, 1922, and though he abandoned it later, his invention stands as of that date. Some ten years earlier the art had devised an attachment to a "full-fashioning" flat knitting machine for the construction of a pointed heel; that is, the reinforcement of the heel by an added thread beginning at a point at either edge of the web and extending inward until it reinforced its whole width. As there are no re-entrant angles in such a pattern, obviously it was only necessary that the nuts should approach during the reinforcement. This was done by mounting them on a reversely threaded screw-shaft, and when the web was finished they were "racked out" by hand to their original position. We shall call this machine the "Gotham"; it would not have been available for Schletter's purpose as it stood, and it did not therefore literally anticipate his invention. But it certainly pressed very closely upon it, and left at best a slim margin for invention; nothing indeed but the train automatically to reverse the rotation of the screw shaft by the pattern belt.

In 1917 at the Nusbaum Knitting Company of Glendale, Long Island, an attachment was made and publicly used which supplied this element lacking in the Gotham machine, though it happened to be attached to a knitting machine for making sweaters, which was not "full-fashioning," because the web for a sweater is not narrowed from top to bottom. Therefore

the stops of the rod of the main thread carrier could be fixed, for the "throw" of that carrier does not change. Nusbaum made over an old "full fashioning" machine, using the existing nuts as variable abutments for stops on the bars which carried the secondary thread carriers, and supplying a new thread carrier and bar for the main thread. This bar he supplied with fixed stops at the ends of the machine, so that its "throw" was constant. The result was substantially the same thing as the defendant's attachment. The single reversibly threaded screw shaft was made into two shafts, it is true; but each of these had twin ratchets oppositely toothed, and a pawl for each ratchet. A separate train led to each of these pawls from one of four rows of buttons upon a single pattern belt. When a button passed beneath the bell crank leading to any pawl, the crank moved a rod which in turn threw a lever into the path of a cam upon the power shaft. The rotation of this cam oscillated a second lever which in turn raised and lowered the pawl and effected a notch by notch rotation of the screw shaft. As each pawl had its own train and was out of engagement when not in motion, no other selective mechanism was necessary. For symmetrical patterns only two trains would have been necessary.

The claims in suit do not incorporate the train which connects the pawls with the power shaft, and there are many differences between the defendant's train and that of the specifications; as many perhaps as between that and Nusbaum's. The patent cannot stand upon any detail of these connections, and indeed the plaintiff does not suggest that it should; if it is valid, it is either because of the novelty of the conception of putting Nusbaum's attachment upon a "full-fashioning" machine, or because of the technical difficulties of executing that conception. Of the second possibility we can dispose at once. It is indeed quite possible that there were in fact obstacles enough to call for substantial inventive capacity; but if so, Schletter did not show how they were to be overcome. With a single exception, to be noted in a moment, he said nothing at all about how his attachment was to be put on. Thus he is involved in a not infrequent dilemma of inventors, who seek to incorporate a new element into an old combination. Either the working out of the conception was so plain that it required only common-place skill, or the specifica-

tions are insufficient because they do not give the necessary directions. It seems unnecessary to labor the point, and the question comes down to the exception. It is necessary in such machines that the reversible screw shaft shall not operate while the "fashioning" stops are moving. Schletter recognized this and provided against it (Figure 11, Specifications page 4, lines 4668). The record does not advise us as to how troublesome the difficulty was, and the claims do not embody it as an element. The plaintiff has not asked us to base the invention upon it; wisely, since the solution was one which could scarcely have foiled a competent mechanic who might learn by experience of the need. Finally, we cannot take seriously the objection that Nusbaum had two oppositely threaded shafts and Schletter had one; the Gotham machine had long since supplied that step.

The plaintiff does not indeed rest so much upon these structural differences as upon the conceptual novelty of the combination, confirmed by a great vogue once it appeared. These were the reasons for its success in Textile Machine Works v. Hofmann (D.C.) 4 F.Supp. 837, affirmed 71 F.(2d) 973 (C.C.A.3), and in the court below in this suit. Its argument follows familiar lines. If it was so easy to combine the earlier elements, why did the art wait so long? The need was not new; no technical obstacles had stood in the way; success was sure to bring substantial gains. The combination should have appeared much earlier, if it lay open to ordinary talent. We have ourselves often reasoned so, for the history of an art before and after the putative invention appears, is the best test when it is available. But it is a dangerous test to apply, and will lead one astray unless jealously watched. Here for example there were only five years at most between the appearance of Nusbaum and Schletter's filing date; that is not a long period, and there is no evidence that people had meanwhile turned their minds to the matter, such as is found at times in intervening unsuccessful patents. Again it is not shown that Nusbaum's attachment had become widely known. Though it was in "public use," that presupposes no real publicity; so far as appears, it made no impression on the art. Yet in estimating Schletter's invention we must assume that it was known to everyone. It does indeed seem as though clocking or other inserts in cheap hosiery, must have been desirable

for a good while before 1922, but one can never be sure; industry is often extremely sluggish and there may have been technical or industrial reasons of which we do not know. Nor are we told by what means the attachment has achieved its success; for all that appears it may have come into strong hands, especially able to exploit it. These gaps in the evidence we are asked to fill in and make a conclusion contrary to the most imperious claims of commonsense; we are to hold that an art which knew how to reinforce "full-fashioned" webs without re-entrant angles, and straight edged webs with such angles, required some uncommon talent merely to conceive of combining the two, for, as we have said, the patent can only stand on the bare conception. Surely that is incredible. It may be that the introducer, the popularizer, of a new and valuable variant, should gather the profits; perhaps any new use should be enough. But the law is not so; we must find a touch of something beyond the ruck of ordinary craftsmanship, either in conceiving a new need, or its satisfaction, or in contriving the means; nothing else will serve.

Since we think the claims invalid for want of invention, we need not consider the other defences.

Decree reversed; bill dismissed.