**SAFETY CAR HEATING & LIGHTING CO., Inc., v. GENERAL ELECTRIC CO. et al.**

No. 224.

Circuit Court of Appeals, Second Circuit.

May 13, 1946.

John C. Blair, of New York City (Robert S. Blair, Edward G. Curtis, and Harold L. Stults, all of New York City, of counsel), for appellant.

Charles H. Walker, of New York City, for appellees.

Before L. HAND, SWAN and PHILLIPS, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, dismissing its complaint which alleged that the defendant infringed two patents: No. 1,708,625 and No. 1,708,626, both issued to Alan Varley Livingston on April 9, 1929. The claims in suit upon the first patent are sixteen, twenty-one and twenty-three; and on the second, nine, eleven, twelve, eighteen and nineteen. The judge held all these invalid upon the prior art, and, as we agree, we shall not consider the question of infringement. Both patents are for improvements in household refrigerators, which operate upon the principle that the heat removed from the objects to be chilled, will be taken up by the evaporation of a liquid refrigerant, which, after being again reduced to liquid by mechanical compression and cooling, is returned to be once more evaporated. The main features of such refrigerators were known long before Livingston filed his applications on March 7, 1925; but the refrigerant after compression used to be cooled by the passage of water around the coils which contained it. That was awkward and expensive, and about 1920 the industry began to substitute fans, which, either then or shortly thereafter, it followed with the natural convection of air currents over the "com-

pressor coils." These two cooling methods have continued in use to the present time, and are now being used in about equal proportions. The compressor and the fan are driven by an electric current passing from the ordinary service connections; and, for the purposes of this case, we shall assume that the current is alternating.

Livingston disclosed a rotary fan driven by one motor, outside the compression chamber, and a compressor in that chamber, driven by another motor. The invention upon which the patents rely is the electrical coupling of these motors. For this Livingston resorted to a device, with which the electrical art had been familiar for over thirty years, and which went by the name of the "teaser" system. The ordinary "single-phase" motor: i.e., one which has only one winding upon the armature, is slow to start; and for that reason it has long been the custom to add a second, or "starting," winding, used as its name implies, only for that purpose, after which it is automatically cut out. A "polyphase motor" may be described most simply as one in which the "starting" winding is never cut out, and the motor is continuously driven by two currents "out of phase." "Out of phase" means that the "peaks" and "troughs" of the alternating current in the "starting" winding do not coincide with those of the primary winding, producing a more uniform torque. The general practice is to have a difference in "phase" of ninety per cent. This apparently has certain advantages; otherwise the defendant would not have made the fan motor "polyphase"; but the record is silent as to what these are. (Possibly, the fan motor may be smaller than if it were "single-phase.") The "teaser" system is one in which the "starting" winding of the primary, or "pilot," motor, is part of a circuit of which the second winding of a "polyphase" motor is also a part. After the primary motor has started and its "starting" winding has been cut out, that winding becomes a part of a complete but independent circuit, in which the rotation of the armature of the primary motor generates a current by induction. Since, as we have just said, the "starting" winding is in series with one of the windings

of the secondary motor and the induced current is "out of phase" with the service current in the other winding, the secondary motor operates as a "polyphase" motor. What Livingston did, was to make his fan motor primary, and by putting its "starting" winding in series with the second winding of the compressor motor, to make that the "polyphase" motor of a "teaser" system. The question is whether this was an invention. For argument we accept the plaintiff's interpretation of the claims in suit as covering a refrigerator in which, contrary to the disclosure, the compressor motor is "single phase," and the fan motor, "polyphase."

It was not necessary that the fan motor and the compressor motor should be coupled at all; each might run upon a separate motor: "single phase" or "polyphase." That of course involves the possibility that one may stop while the other keeps on; and it was Livingston's principal object to avoid this by making sure that the compressor motor could not operate, if the fan motor stopped. Apparently he supposed that if this happened, explosive pressures would be set up in the "compressor coils." The testimony upon the issue is in dispute and the judge made no finding; but, whatever is the truth, in the defendant's "Hotpoint" refrigerator—the infringing device—, the compressor motor is "single phase" and will operate regardless of the fan. If therefore the claims are to include such a system, they cannot stand in any degree upon this putative safeguard. Moreover, any such consideration aside, if coupling the motors was desired there were other ways of doing it. For example, Patent No. 1,819,523, issued to Terry, on August 18, 1931, upon an application filed in 1928, disclosed a magnetic coupling through the wall of the compression chamber. This was entirely practicable: the Westinghouse Company, for which Terry invented it, used it for a time, and abandoned it only because, in Terry's words, it "proved to be too expensive to manufacture." Finally, as we have already said, it is not necessary to use a fan at all. Half the refrigerators made by the defendant use air convection; the compression coils are set at the back of the re-

frigerator and the heat from the compressed refrigerant acts as a kind of chimney for the passage of air from the bottom to the top. Moreover, the Westinghouse Company, which began to use a fan in 1935, gave it up in 1941; and adopted condensation by natural draft.

In appraising an inventor's contribution to the art, as we have often said, the most reliable test is to look at the situation before and after it appears. Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable. No objective standard is practicable; (Kirsch Manufacturing Co. v. Gould-Mersereau Co., 2 Cir., 6 F.2d 793; Potts v. Coe, 78 U.S.App.D.C. 297, 140 F. 2d 470; as, for example, whether each of the elements operates in a different way from what it did in other combinations. That is almost never true of a machine; each member ordinarily performs the same mechanical function which it does in any other machine; it is their cooperation that produces the result, and the value of that cooperation depends upon the sagacity which divined the end and fabricated the means. Courts, made up of laymen as they must be, are likely either to underrate, or to overrate, the difficulties in making new and profitable discoveries in fields with which they cannot be familiar; and, so far as it is available, they had best appraise the originality involved by the circumstances which preceded, attended and succeeded the appearance of the invention. Among these will figure the length of time the art, though needing the invention, went without it: the number of those who sought to meet the need, and the period over which their efforts were spread: how many, if any, came upon it at about the same time, whether before or after: and —perhaps most important of all—the extent to which it superseded what had gone before. We have repeatedly declared that in our judgment this approach is more reliable than a priori conclusions drawn from vaporous, and almost inevitably self-dependent, general propositions. Kurtz v. Belle

Hat Lining Co., 2 Cir., 280 F. 277; Franc-Strohmenger & Cowan, Inc., v. Arthur Seigman, Inc., 2 Cir., 27 F.2d 785; Ruben Condenser Co. v. Aerovox Corporation, 2 Cir., 77 F.2d 266; Textile Machine Works v. Louis Hirsch Textile Machines, 2 Cir., 87 F.2d 702; Electric Machinery Mfg. Co. v. General Electric Co., 2 Cir., 88 F.2d 11; Minton Manufacturing Co. v. Continental Briar Pipe Co., Inc., 2 Cir., 93 F. 2d 271.

So judged, Livingston's invention cannot stand. As we have seen, it appeared only five years after the industry had taken up air cooling at all; and it was not the first fan cooled refrigerator.* No one had tried and failed to couple a compressor motor within the compression chamber with a fan outside. On the contrary, not only had Terry designed an entirely successful coupling, quite as serviceable as Livingston's, but in 1929, only a month after the patents in suit appeared, Conrad of the Westinghouse Company suggested precisely the "teaser" system, used by the defendant; and there is no reason to suppose that he borrowed it from the patents. Again, Livingston's chief object —to make the compressor dependent upon the fan—the art never took up at all, and pro tanto the invention was still born. Incidentally, in order to accomplish this he had to make his fan motor many times larger than anyone else has ever made it. Next, the fan itself is not a necessity; cooling by convection shares the field with it, and the Westinghouse Company has quite given up the fan, in spite of a paid up license. True, the Westinghouse Company did use it for six years, and that too under its license; but the license is the veriest featherweight. It covered nine other patents than Livingston's; and the consideration was $10,000 (which the judge rightly characterized as a mere "pittance"), together with a license upon two patents, one of which apparently the plaintiff has never exploited, and about the other we know very little. Ruben Condenser Company v. Copeland Refrigerator Corp., 2 Cir., 85 F.2d 537, 540; Cleveland Trust Co. v. Osher & Reiss, 2 Cir., 109 F.2d 917, 922.

---

* Williams, No. 1,313,363 (1916); Buchere, No. 1,419,215 (1921).

As for the defendant's user, it did not begin until 1937, when the patents had more than half expired. Why did it wait so long if the invention was of importance? Certainly so well informed a company knew of the Livingston invention. While it is of course true that a "polyphase" fan must have some merits, else the defendant would not have adopted it, the evidence we have just summarized satisfies us that it is only one of that myriad of variants which every active art proliferates, and which demand nothing more than ordinary craftsmanship in the field. If the stoppage of the fan had proved a real danger, against which, after a period of unavailing experiment, Livingston had provided the remedy, much could be said; but, since the claims must be expanded so as not to avoid that danger, if it exists, the invention dwindles to an insignificance that will not support a monopoly. Particularly in these days when the test of invention has become increasingly so severe, we cannot conceive why the claims should have ever been passed, unless, indeed, they were assumed to read literally upon the disclosure. Perhaps they were; but that construction of them the plaintiff disclaims, as we have said.

Judgment affirmed.