**SARAZIN et al. v. WRIGHT AERONAUTICAL CORPORATION.**

District Court, S. D. New York.

Jan. 12, 1944.

Hoguet, Neary & Campbell, of New York City (Walter H. Free and John F. Neary, Jr., both of New York City, of counsel), for plaintiff.

Ward, Crosby & Neal, of New York City (S. Mortimer Ward, Jr., Kenneth S. Neal, and Joshua Ward, all of New York City, of counsel), for defendant.

James B. M. McNally, U. S. Atty., of New York City (William L. Lynch, Asst. U. S. Atty., of New York City, of counsel),

for Leo T. Crowley, Alien Property Custodian of United States.

BRIGHT, District Judge.

This action is brought by the patentee Sarazin and the exclusive licensee Hispano-Suiza, to enjoin an alleged infringement of two patents for "Means adapted to reduce the torsional oscillations of crank shafts". The first (referred to during the trial as the link type), is No. 2,079,227, was applied for on July 30, 1931, and issued on May 4, 1937. The second is Reissue No. 20,773, and was originally applied for with the first. The Patent Office required a division, the application was renewed on February 29, 1936, and granted May 4, 1937, the patent issuing as No. 2,079,226. The Reissue was applied for on December 9, 1937, and granted June 28, 1938. Plaintiffs also seek an accounting and that damages be trebled, because of the alleged wanton nature of the infringement. As the basis for the latter, it is alleged that the licensee and defendant had maintained a business practice and confidential relationship which the defendant violated by its opposition in the Patent Office to the application for the reissue patent, and by entering into a contract with a concern known as APIC which restricted it in its dealings with the licensee

The claims alleged to be infringed are 11 to 16, inclusive, of the '227 patent, and 5, 6, 8, 9, 10, 12, 13, 14, 15 and 16 of the Reissue. The claimed infringing mechanism is that used by the defendant, known as the Chilton or Wright damper, made under United States patent No. 2,112,984, granted to Roland Chilton on April 8, 1938, pursuant to his application of February 21, 1935.

The two patents in suit are directed to the problem of reducing torsional oscillations of crank shafts. It is said to be well known that crank shafts of motors of Diessel engines, internal combustion motors and the like, having a variable speed and torque in their revolution, display in any sequence of distribution along their length inertias and resiliencies giving rise at certain velocities of revolution to torsional resonance speeds due to the harmonics of the driving torque and to the inertia of the pistons and connecting rods. The crank shaft of an engine has frequency at which it will vibrate in response to impulses delivered to it by the firing pistons. If these impulses, or torsional vibrations, become of a frequency in resonance with the natural frequency of the crank shaft, serious damage to the engine may ensue. The problem of damping, neutralizing or overcoming such vibrations in internal combustion engines of variable speeds is claimed to have been solved by Sarazin and Chilton.

It is not disputed that the solution of such damping or neutralizing as relates to machines running at fixed speeds was accomplished some time before either of the patents mentioned. The problem involved in this case relates to an engine running at variable speeds. It seems to be conceded that a damping device for a fixed speed will become ineffective and probably make the vibrations worse at speeds different than that to which it is tuned. For engines that change speeds during operation, such as those used for automobiles, airplanes, boats, etc., a problem of vibration is created that becomes more acute as the engine speed increases.

All three patents are of centrifugal pendulum devices affixed firmly to the crank shaft, to which devices are attached, or in which are contained, masses which oscillate as they revolve with the shaft, and are designed to oppose by counter vibrations the vibrations of the shaft.

Plaintiffs contend that their two patents make six important and new contributions to the art—

1. The use of a centrifugal pendulum with small friction as a vibration damper which will neutralize one order of vibration at all speeds. They define "order of vibration" as the number of vibrations per revolution, as distinquished from "frequency of vibrations", used to indicate the number of vibrations per minute or other fixed period.

2. The use of a free bifilar pendulum so that large masses may be used and will neutralize a high order of vibration at all speeds.

3. Provide a centrifugal pendulum designed according to a specified formula, that will neutralize a pre-determined order of frequency at all speeds.

4. Provide a system which is balanced at every instant of motion so that secondary vibrations of the engine are not produced by the action of the damper.

5. Provide certain embodiments which are not influenced by gravity, and do not affect the frequency of the pendulum.

6. Provide in the reissue patent for a roller as a friction reducing means and as means for obtaining a short radius of action,

We are concerned, thus, with an invention (1) of a free centrifugal bifilar pendulum damper, (2) with small friction (3) designed by formula so that it will neutralize a predetermined order of vibration at all speeds, (4) in which reduction of friction and a shorter pendulum may be obtained by the use of rollers. We are not concerned with points 4 and 5. They are not urged as having been infringed, and were not.

Eight patents preceding Sarazin are cited —Frahm United States patent 989,958, April 18, 1911; Siemens-Schuckert German patent 272,575, May 21, 1911; Siemens-Schuckert Austrian patent 72,077, February 1, 1916; Lanchester British patent No. 262,174, December 1, 1926; Salmson German patent 487,753, August 4, 1927; Chenard French patent 632,017, December 30, 1927; Griswold United States patent 1,874,040, applied for October 26, 1928 and issued August 30, 1932; and Carter British patent 337,466, November 3, 1930.

A reference to those patents will assist in the solution of the problem by contracting the field into which the patents in suit were born. Neutralization of vibrations is not a new thought. Application of its principle was made long before the time now under discussion. The familiar illustration of the command to marching men to break step while crossing a bridge comes readily to mind. The general principles of vibrations in bodies and their neutralization was discussed and applied by Frahm in 1911. He and many others following him, attempted to solve it by the use of springs and friction in varying degrees. His invention taught the damping or avoidance of disturbing vibrations by means of an auxiliary body, within or on the main body whose vibrations are to be damped, whose vibrations, caused by those of the main body, have as nearly as possible the same period as the main body. Thus the resonance vibration of the main body is annulled by those of the smaller auxiliary body. The fundamental principle of that invention is a pendulum to which is attached a smaller pendulum reacting 180 degrees out of phase against the primary disturbance. It is clear that pendulum neutralization, as well as the problem of tuning such neutralizer to the vibrations to be neutral-ized, was then within the knowledge of the art. He was the first to teach the use of a mass pendulum tuned to, a fixed frequency of neutralized resonance vibrations which arise in bodies subject to periodic impacts. And his remedy was friction.

The Siemens-Schuckert patents are both of the same device, and in my opinion, teach the use of a centrifugal bifilar pendulum mass which will rotate with the shaft. U-shaped tubes of liquid form a supplemental flywheel which are to be tuned "by means of suitable dimensioning" in such a way that precise resonance with the number of driving cycles prevails. The liquid flows to and fro in connection with the irregular movement of the machines, and centrifugal force not only brings about its oscillation, but also keeps the liquid in the two branches of the neutralizer at the same radius. The Austrian patent, granted after the German, more completely explains the invention. It clearly teaches tuning to the oscillation of the driving force by the use of columns of liquid adjusted as to oscillation and "for making it variable within various limits"; and they "exactly counteract the impulses of the driving force and keep in equilibrium with it at every moment". This device would seem to be in its essentials almost frictionless. Like Sarazin, however, it teaches the application of more friction to regulate oscillation. Anticipating one of the claims of Sarazin to a free bifilar centrifugal pendulum, the specification in the Austrian patent states that its object is to make use of the phenomenon of the double pendulum, that a movable mass whose driving force fluctuates rythmically does not follow these fluctuations if there is attached to it, "so as to be capable of swinging freely", a second mass whose natural oscillations are in resonance with those of the driving force. It specifically claims an invention characterized by the fact, "that the duration of oscillation of the columns of liquid is regulated automatically in dependence upon the fluctuations of the driving force". I am impressed that this patent teaches that its device oscillates automatically and adjusts itself to the requirement of the situation, and that such adjustment is produced by the fluctuations of the driving force. It clearly recognizes that the duration of oscillations "increases and decreases with the pendulum length", and that may be accomplished without any-

special devices and by change in the filling of the tubes.

The Salmson patent makes use of a centrifugal unifilar pendulum situated in the counterweight which forms an extension of the crank, in much the same way as the Chilton damper. The single mass installed in the counterweight "is able to shift freely" from side to side, and there is correspondingly much more friction because of its sliding than in Chilton with its rollers. It is stated, however, that if more than one mass is required, they may be fashioned in the form of discs so as to be capable of rolling. It might then become a bifilar centrifugal pendulum and friction would be lessened. This patent obviously teaches friction both in the fact that the mass slides as well as in the fact that friction may be increased by the introduction of oil in the chamber in the mass in which it is located. It is obvious, also, that it was known then that the pendulum length was an essential consideration to the proper working of the device.

Figure 3 of the Chenard patent shows a device much like the Chilton damper in appearance. It is a centrifugal bifilar pendulum damper which is aperiodic in its operation (that is, it does not oscillate), in contrast to the Sarazin and Chilton devices. It depends upon friction for its reactional effect.

Finally, we have the Carter patent which clearly taught friction as the solution of the vibration problem. It resembles in form and is to be applied in somewhat the same manner as the Chilton damper, that is, in the counterweights of the crank shaft. The Carter design is obviously a centrifugal pendulum, and its neutralizing effect is obtained by vibrations of a mass sliding or rolling in a cavity somewhat larger by means of which the radius of the swing of the pendulum may be adjusted.

I do not think the Lanchester or the Griswold patents in any way help in the solution of the problem. They are both friction dampers. The Lanchester device is a flywheel, not rigidly connected with the shaft and in operation acts as a brake upon the shaft. The Griswold device increases its friction with the speed of the shaft. Neither is a pendulum device.

It will thus be seen that when Sarazin filed, it was known that damping of torsional vibrations could be accomplished by unifilar or bifilar centrifugal pendulums, which freely moved, whose effectiveness depended upon the use of more or less friction, whose oscillations could be controlled by the pendulum length, and whose action was tuned to a fixed order at a predetermined speed. The installation of the neutralizing masses in the crank shaft so as not to increase the weight of the crank shaft, as well as the use of rollers upon which such masses could move, was also known. What then additionally did Sarazin teach that was not already known? It is said that it consisted in two things— a pendulum designed according to a specific formula which would neutralize a predetermined order of vibration at all speeds, and the use of rollers to obtain a short radius of action requisite for high orders of vibration.

It is conceded that Sarazin could not patent a formula nor a principle of natural law. The distinction here sought to be emphasized, however, is that preceding inventors tuned their dampers to a frequency and not to an order of vibration, and that as the frequency changed with the speed and the dampers would not change, when the speed or frequency to which they were tuned did change, the dampers became a liability rather than a neutralizing force. I cannot, however, eliminate from my thought the fact that even though there is no specific statement in the previous patents that the tuning should be to an order, the patentees knew that to make their dampers effective they must be so tuned. Concededly, the natural frequency of any crank system could be ascertained. It was known that vibrations in shafts as they increased in speed increased in frequency; in other words, the more rapid the explosions in the cylinders, the more frequent the twist or torque on the shaft. Concededly, there was no difficulty in determining what the frequency or order of the torque would be per revolution. They would depend generally upon the number of cylinders firing and the frequency per revolution at which the explosions occurred. It is admitted that the frequency per revolution of an engine shaft is constant at all speeds. What genius, other than mechanical genius of a skilled artisan, was required to know that it would be necessary to tune to a vibration that was constant in order to counteract the effect of that impulse? The manner of computing the frequency of a pendulum was known long before Sarazin filed. Laymen even knew the shorter the pendu-

lum the faster it would swing. And it is conceded that any skilled mathematician could work out a formula by which to determine the length of a pendulum to counteract any known order of vibration of a shaft, and this could be accomplished for a centrifugal pendulum as well as for a simple one controlled by gravity. It was testified that the application of well known laws of motion would enable one to understand the nature of the vibrating masses to a sufficient extent to derive such a formula. And, concededly, it was well known that a frictionless centrifugal pendulum damper will swing 180 degrees out of phase with the vibrations of a shaft to which it is attached and completely neutralize them. And it seems to have been clearly within the ken of those skilled in such work that the pendulum length may be regulated by the difference in the size of the pins and the holes in which they work, or in the difference between the radius of a wheel or roller and the radius of the arc upon which the wheel or roller travels. Upon the trial, there was no dispute but that once a centrifugal pendulum damper is tuned, it will make the same number of countervibrations per revolution of the shaft to which it is attached at any speed; that seems to be its inherent nature governed by natural law. Thus, it seems to me, Sarazin's claims of invention, boil down to the one proposition that he was the first to suggest the tuning of a damper to an order per revolution rather than to a frequency at some fixed speed. The question here is whether that was a discovery. I think the answer must be in the negative, both for the reasons assigned as well as for the reason that the weight of the evidence requires such a finding.

Nor do I see that there has been any infringement by the Chilton damper either of Sarazin's '227 patent, the link type damper, or the reissue. Chilton does not use links in his neutralizing device. And the proof shows without a substantial dispute, that in order for the damper to work efficiently and be 180 degrees out of phase with the disturbing force, it should be as nearly as possible frictionless. Plaintiff's expert does not deny this as a general proposition, but asserts that friction is sometimes desirable when there is more than one order of vibration in the crank system to be damped; in that situation, he contends that the application of some friction will neutralize all of the orders

sufficiently so that the disturbing vibrations will never reach a critical stage. It is shown without dispute that Chilton's damper is so frictionless as to neutralize disturbing vibrations in the crank system to an extent that they are not revealed by the torsiograph; they are practically eliminated.

Sarazin did not teach reduction of friction. Both of his patents disclose a device which operates wheels or rollers turning upon axles. The presence of the axle connotes friction. It is testified practically without contradiction that under the immense pressure of centrifugal force when an engine is being operated at high speeds these axles would fail for the reasons that as designed they are not strong enough to stand up under the pressure, and at the time of the invention they were incapable of proper lubrication; and if larger axles were used, the friction would be increased, and the problem of lubricating would still be present. The only other teaching in his patents relate to the application of more friction to dampen the action of the masses which are supposed to vibrate out of phase with the disturbing forces. There is no dispute that the Chilton device has much less friction than either of the Sarazin dampers; and that is obvious by a mere examination.

Further, the Sarazin devices are separate instrumentalities added to a crank system and thus increase the weight on it. Chilton's damper is a component part of the counterweight always present on a crank shaft, and adds nothing to its weight. Sarazin's devices, at least from the illustrations in the patents, require a plurality of masses and that fact is claimed as contributions 4 and 5 previously referred to, and are quite complicated in their structure. Chilton's neutralizer has but one mass, and is most simple in its several parts. The rollers or wheels in the Sarazin devices are a part of the mass; Chilton's rollers are not and merely translate the vibratory movement and force. Although specifically so claimed in the Sarazin reissue patent that the rollers and wheels are the sole force transmitting instrumentality between the masses and the curved path upon which they operate, it is obvious that they are not such sole transmitting force because the force would first attack the axles of the rollers or wheels and by those axles would be transmitted further. Chilton's floating rollers operate substantially without friction in exactly similar race-

ways and actually constitute the sole transmitting means between the members of the damper, thereby eliminating completely to all practical purposes the vibrations to be neutralized.

The reissue patent is the substitute for Sarazin's patent 2,079,226, granted May 4, 1937. That patent and the '227 patent were applied for in the same instrument filed July 30, 1931. A division of the two was required by the Patent Office on August 2, 1932, and thereafter the file wrapper of the original application was continued with reference to the baby carriage type, ultimately concluding in the '226 patent.

It is obvious, from the disclosure originally made and filed by Sarazin for both patents, that there was no teaching of reduction in friction but rather a teaching of friction and more friction. In the specification originally filed, which is to all intents and purposes, identical with the specification contained in both of the present patents, he does speak of "mobile" masses adapted to move at an angle relatively to the shaft of the motor, and that they may likewise be radially movable, but it is clear that the use of the word "mobile" has no reference to the want or presence of friction in its essential relation to this patent. It refers more, in my opinion, to the fact that the mass must swing or vibrate to some extent; it does not acquire a meaning that such swing shall be frictionless or of a 180 degree out of phase character, and the specification does not so state. In fact, whenever friction is discussed it is to add it. As then disclosed, the purpose of the baby carriage type embodiment was to demonstrate how "to reduce as far as possible, the length of the hinged links or connecting rods"; in other words, to teach how a shorter radius or pendulum length might be obtained. The rollers and bosses mentioned in that patent are nowhere described as intended to reduce friction. And the claims then made no mention of "substantially without friction" "freely rolling" or "freely retaining". When his application for both patents was made there were many anti-friction devices known, but Sarazin did not refer to or show any of them; and his bearings were all sliding bearings with high friction under the pressure of centrifugal force.

The specification was not thereafter amended in any material respect, the changes being only those required because of the division of the two disclosed methods of neutralization.

After the rejection of the first claims by the Patent Office, the subsequent claims contain the words "swinging masses" which mean no more than that they should be mobile. The application for the baby carriage type patent was first allowed on July 1, 1935. On March 6, 1936, Sarazin filed a renewal application upon this type, and at the same time sought amendment of his claims through new attorneys. The application for the patent was again approved and allowed as of November 3, 1936. On March 4, 1937, another amendment was filed in which, for the first time, appeared the words "substantially without friction" and "freely rolling", in additional claims. The application as thus amended was allowed, and the quoted words became part of claims 21 and 23 of the '226 patent of May 4, 1937.

In the meantime, and on October 3, 1934, Chilton had invented his damper with the two rollers and prepared a blueprint thereof. Sarazin on December 12, 1934, had applied for a German patent No. 709,268, issued July 3, 1941, which he states, in his application, relates to a contrivance for damping oscillations by means of loose auxiliary masses subjected to centrifugal force, which are in engagement, by means of two or more rolling bodies, with the oscillating part which carries similar rolling paths. He further says that such contrivances are well known, and in those known the rolling bodies are supported on auxiliary masses by means of axles and bearings closely surrounding the axles; that the centrifugal forces occurring in the rotation of the shaft produce high pressures in the bearings so that there arise frictional forces which are capable of interfering with the pendulum movement of the auxiliary masses, which drawbacks are avoided by his new invention, and because rolling bodies on rolling paths prevent sliding friction. In the figures submitted with the patent are devices with no axles.

In passing, it is interesting to note that Sarazin on November 21, 1935, applied for a United States patent on the same device described and illustrated in this German patent, his application was granted and patent issued as No. 2,127,888 on August 23, 1938; but in that application, the statements in the German application with reference to the previous art were omitted, except that he did state that his new device

was better adapted to meet the requirements of actual practice than devices of the same kind used up to that time. An interference proceeding brought by Sarazin upon this new United States application against Chilton resulted favorably to Chilton, who was awarded priority of invention of the subject matter on November 10, 1937.

The nature of the Chilton damper (applied for February 21, 1935 and granted April 5, 1938 as No. 2,112,984) was publicized in the Aviation Aero Digest in April 1935, and copies of the blue prints thereof sent to Hispano-Suiza on May 6, 1935, along with a crank shaft with it on, the blue prints being received by Hispano-Suiza on May 16, 1935, and the crank shaft assembly about the middle of June of that same year. Sarazin saw the blue prints in July 1935, a year and three-quarters before his amendment of the baby carriage patent so as to include the words "substantially without friction" and "freely rolling".

Salomon, another French inventor, applied for an English patent No. 401,962, on April 6, 1933 (his French application was April 7, 1932) and it was granted on November 23, 1933. In his invention, he stated that it consisted partly in the use of auxiliary masses adapted to oscillate "without friction or with very little friction". Sarazin and his French attorneys knew of this patent. Obviously, Sarazin, contrary to his prior teachings, began to realize that centrifugal pendulum dampers to be efficient should be substantially frictionless. That is observed in his German patent to which reference has been made, in his French patent 773,520 applied for May 22, 1934, in which he criticized his previous link type damper because of the fact that centrifugal forces acting upon the movable masses would occasion strong pressure so that the frictions produced upon the sliding surfaces would prevent more or less the free oscillation of the masses, and thereby the anticipated damping effect; and his new application was to avoid that drawback.

On January 7, 1935, he applied for a French patent upon the contrivance shown in his German patent referred to above. In that application, he stated that centrifugal forces produced forces of friction which disturbed or even prevented the pendular moving of the masses, the damping action sought is no longer obtained at all, and that the then proposed invention made it possible to avoid the drawback mentioned "because absolutely no sliding friction is produced and because the length of the pendulum can be shortened at will."

It is my opinion, and I so find, that the teaching of reduction of friction or of no friction, was never within the contemplation of Sarazin when he originally applied for his United States patents. Were that not so, it seems strange to me that he did not bring an action similar to the present against this defendant, basing his claim for relief upon the '226 and '227 patents, for it is shown without dispute that the Chilton device was manufactured and in commercial use from January 1935 on. One conclusion would seem to be proper under these circumstances, and that is that he did not consider that there was any infringement.

On January 9, 1937, he filed his application for the reissue of the '226 baby carriage type patent granted May 4, 1937. He did not change in any important particular the specification previously submitted. He had known, as I have stated, all there was to be known about the Chilton device since the preceding July 1935. In the new application for the reissue, in which there were forty-three claims, the first six as then submitted, used the words "freely retaining said mass against the action of centrifugal force"; and claims 7 to 22 inclusive contained the words that the weight means move with respect to the shaft "substantially without friction" and that the engagement by centrifugal force of the surfaces was to be "freely rolling engagement". The oath submitted with that application gave as one of the grounds for the reissue that his attorney failed to appreciate the broadest aspects of his invention and omitted to explain the same as, broadly as he believed himself entitled to; that on October 8, 1937, he conceived certain possible modifications of his invention untilizing the general principles thereof; that he consulted his French attorney, who suggested that probably the proper solution was by a reissue application and his American attorneys were communicated with for that purpose. The communication by his French attorneys to his American attorneys states that the purpose of the reissue was because the situation was extremely complicated by the Salomon application in the United States, based on his French patents, and to define

the invention by the character of the path followed by the center of gravity of the moving mass. But the proposed amended claims submitted, in addition, included the words "substantially without friction" and "freely rolling engagement".

All of the claims were rejected on December 21, 1937 as being based upon an inaccurate, insufficient and misleading disclosure for multiplicity, and for other reasons based upon prior art. Answering the rejection, four new claims were submitted in which the words "substantially frictionless", "free rolling engagement" and "freely retaining" were still used. On May 23, 1938 all of the claims submitted were cancelled by the applicant, and sixteen new claims were filed which are substantially, and I think exactly, the same as are contained in the present reissue patent. The words "substantially frictionless", "free rolling engagement" and "freely retaining" were dropped, and that abandonment of those particular words may have some significance. There were substituted for them "friction reducing" and "rolling engagement".

In the meantime, and on April 13, 1938 defendant protested against the reissue claims. As a result of that protest, all of the claims except what is now No. 11 in the reissue patent, were rejected.

There is much discussion (I think well founded) in the file wrapper adverse to Sarazin. Notwithstanding, however, the reissue patent was finally allowed with the claims as last proposed containing the words "friction reducing" and "rolling engagement". None of the claims contained in the original '226 patent, except claim 11, are found in the reissue.

I do not think that prior to the reissue, Sarazin ever disclosed in the prosecution of either the '226 or '227 patents, any friction reducing means, or any teaching of it, and that the reissue patent is, therefore, void. He certainly could not originally claim and disclose friction and increased friction, and thereafter attempt to procure the reissue which made claims of friction reducing and free movement. Schreiber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 58, 59 S.Ct. 8, 83 L.Ed. 34.

I have not and shall not discuss at length plaintiff's contention that the defendant had breached the relationship of trust and confidence existing between it and Hispano-Suiza, for the reasons that the propositions already discussed seem decisive of the case; and plaintiff does not urge that defendant's action has any determinative effect as to the validity of the patents or their infringement; but does foreclose it from any equitable considerations which might otherwise be urged by it.

█ Defendant, during the course of the trial, offered in evidence five patents obtained by Sarazin subsequent to his application for the patents now in suit, to show alleged admissions derogatory to his present position. These patents were his British 444,222, his French 773,520 and 783,734, his German 706,268, and his Swiss 175,420, all contained in defendant's Exhibit Q. Plaintiff objected to their admission, and the court's ruling was reserved. I have concluded to overrule the objection, and plaintiff may have an exception. These patents are received as having a bearing upon whether or not Sarazin's original disclosure in his application for the '226 and '227 patents taught friction and more friction or no or reduced friction. I think they may be properly received as admissions against interest, and for the same reason, I do not think the cases of General Electric Co. v. R. P. Mallory & Co., D.C., 286 F. 175, 179, Deitel v. Unique Specialty Corp., 2 Cir., 54 F.2d 359, Catalin Corp. v. Catalazuli Mfg. Co., 2 Cir., 79 F.2d 593, and Hartford-Empire Co. v. Swindell Bros., 4 Cir., 99 F.2d 61, are controlling. But regardless of these patents, and without taking them into consideration, I think the facts disclose that there was no teaching of reduction of friction until after Sarazin was informed by Salomon and Chilton, and by the discussion of others, that to be efficient a damper must be practically frictionless.

The further contention that the alleged admissions are not connected with the devices in suit I think is clearly disproved by a comparison of the figures submitted with the foreign patents and those upon which this action is based.

█ Since this case was tried, Leo T. Crowley, Alien Property Custodian of the United States, has by motion, requested that he be substituted as plaintiff herein in the place and stead of the plaintiffs above named, who are French nationals. It appears from the motion papers that on March 11, 1942, he was appointed such Custodian by the President of the United States, and that on May 29, 1943, he declared himself vested with all right, title

252

and interest, including all accrued royalties, and all damages and profits recoverable at law or in equity, from any person, firm, corporation or government, in and to the patents in suit. The motion is not opposed by plaintiffs. Defendant, however, opposes, contending that there is danger that any adjudication in its favor after such substitution might not be binding upon the present plaintiffs in any future litigation they might see fit to bring, particularly in view of the fact that they might question the legality and constitutionality of the seizure as against citizens of friendly countries, and as in violation of treaty rights with France; and that in the event such seizure might later be declared illegal, defendant would have to relitigate the present cause of action. It does not oppose the Custodian being made a party plaintiff with the present plaintiffs.

The Trading With the Enemy Act, Act 1917, Chapter 106, 40 Stat. 411, as amended 50 U.S.C.A.Appendix § 1 et seq., authorizes, I think, the Alien Property Custodian to exercise any right, power or privilege with respect to any property in which any foreign country or a national thereof has any interest, in the manner set forth in the act, whether such foreign national is or is not an enemy. The Custodian is, therefore, lawfully entitled to the possession of and title to the property declared to be vested in him. Farmers' Loan & Trust Co. v. Hicks, 2 Cir., 9 F.2d 848–853, cert. denied 269 U.S. 583, 46 S.Ct. 120, 70 L.Ed. 424. This includes his right to seize and become vested with patents, royalties under license agreements, and even the rights left in owners to recover for the use of the patents before seizure. Farbwerke, etc., v. Chemical Foundation, 283 U.S. 152, 161, 51 S.Ct. 403, 75 L.Ed. 919. Since November 8, 1942, when this government included France in enemy territory, France has been an alien enemy within the purview of the Act. Government of France v. Isbrandaten-Moller Co., D.C., 48 F.Supp. 631–633. The airplane motors using the Chilton damper which have been and are now being manufactured by the defendant are, as I understand it, being furnished exclusively to our government in the prosecution of the war. That being so, part of the claim, if any, vested in the Alien Property Custodian, would be against the government he is representing. Under the circumstances, therefore, I think the motion should be granted to the extent of permitting the Custodian to intervene and be added as an additional party plaintiff, and that all pleadings, motions, briefs and other papers heretofore filed herein by or on behalf of the plaintiff and otherwise, stand of record for the benefit of such custodian. The Pietro Companella, D. C., 47 F.Supp. 374; United States v. The San Leonardo, D.C., 51 F. Supp. 107. In other respects, the motion is denied, and the order upon the motion will be settled on notice.

The complaint of the plaintiff is dismissed upon the merits, with costs and disbursements to be taxed. The defendant may submit proposed findings, serving a copy thereof upon the plaintiff's attorneys, who may have ten days after such service in which to file with me objections to any of such findings.